to our last case this morning, United States v. Peter Armbruster. Mr. Devote. May have pleased the Court. I believe I reserved three minutes of time for rebuttal, Your Honor. That's fine. Thank you. Your Honor, this case comes before Your Honors this morning. After a trial last summer, we were able to work in before the Delta wave in Milwaukee. Mr. Armbruster had been charged with 15 counts in connection with his role as the CFO of Roadrunner Transportation. He had been accused of being a quarterback of a wide-sweeping accounting fraud. Mr. Armbruster was found not guilty of 11 of those counts, including the conspiracy counts, bank fraud count, and a number of other crimes. He was convicted of four counts, two with falsifying company books of a public company, one related to a management representation letter, and one for a 10-Q for a quarter. And the other two defendants were acquitted, right? They were, Your Honor. They were. There are two individuals that were subordinate to Mr. Armbruster. They were initially charged in the first indictment, and Mr. Armbruster was brought into the case in the superseding indictment with them. That's right, Your Honor. And we recognize, Your Honor, the well-established standard on a sufficiency of the evidence claim that we face and the rigorous standards that it is. We respectfully submit that this case is one of those unusual instances when you look at the evidence that is relied upon to defend these four counts that we can demonstrate that there wasn't sufficient evidence. Mr. DeVoe, can I ask you a question just to get the benefit of your response to some of the particulars on the evidence? Suppose under the standard that you just recognized that the jury credited all of the evidence, mainly testimonial it seems to me, that was in front of it regarding that so-called whiteboard meeting from the fall of 2016. Because under the standard, I think we have to assume the jury credited it. Okay? Isn't that a major problem for your client? Your Honor, I certainly acknowledge the testimony of Ms. Hipke in particular, but I think that for our position on that, a key point here is that there was evidence that respectfully I think this jury disregarded that I don't think a rational jury could disregard, and that was the context of this amount, the $25 to $50 million, Your Honor. The government's argument at trial was there was a tidal wave of problems, basically, to number 10. But the problem with that is the government's own exhibits, Exhibit 30 and 30A, and then two of our exhibits, 3057 and 3058, showed that 60 individuals, the entire leadership of Roadrunner, understood that those known issues, supposedly known issues that constituted the bulk of that money were fourth quarter issues, not third quarter issues, Your Honor. In other words, the financials were not, there was nothing materially misleading about the including, I think this is really important, Kurt Stolten, who even after a restatement, even after Deloitte & 2 signs off on a restatement, he continued to be the CEO of that company through 2020. He's one of those six individuals who all understood these were Q4 issues, not Q3 issues. And that's why I think that the- How do you explain the various emails in the spreadsheets, though, that put some of this back in 14? Yes, Your Honor. So, in terms of 14 going back, the issue was first raised at Intermodal in 2014 by Mr. Armbruster, because he was concerned about the company's cash flow problem. And at that point, he handed that over to some of these subordinates to look at this issue and to look at the balance sheet at Intermodal. And I think, Your Honor, like- And all that stuff carried forward, right? They weren't reserving against the IKEA receivable, they didn't write down the prepaid tax- That's right, Your Honor. They carried them forward, and you get to- And this- What's his name? Chris Lacey joins the firm, joins the company, and it kind of all comes to a head. Well, yes, Your Honor. I think one important point there is that there's no allegation the $25 to $50 million relates to Intermodal, right? The two counts of conviction are the $400,000 and the $600,000, and the two separate accounts at Intermodal. And- Was it- Do I have it right? So, the IKEA receivable and the prepaid- Exactly. IKEA-Marisk is $400,000, and the prepaid was $600,000. Okay. And the point, I think, when you look at the four core witnesses the government relies on, Mr. Kersell, you have Mr. Voorhees, Ms. Hipke, and Mr. Lacey, that you see a pattern of there's not evidence Mr. Armbruster received documents showing this should be written off, and that when they talk about the knowledge or the communications with individuals, they're not communications with Mr. Armbruster about these two accounts. One of the problems we have is the government's case was broad and sweeping. They were talking about big picture on some of this testimony, and it doesn't specifically talk about IKEA-Marisk, or it doesn't talk about prepaids. And there's similarly evidence that they start to conflict with each other. Mr. Voorhees, an immunized witness, talked about how he finished his reconciliations, and it was a $4 to $5 million amount that he had done when he left in April of 2016. But Ms. Hipke, another immunized witness, plainly said that he hadn't finished the work, and when she got his document- These two particular accounts, though, I'm sorry to pepper you like this, these two particular accounts were on Mr. Armbruster's radar screen, because in May of 2014, he sent an email to the board saying that he himself had a lot of questions about specific items at Intermodal, and two of the items listed, I think among others, were these two. Yes, Your Honor, absolutely. And so he did, and then- So the jury knew it. The jury knew- I mean, the government's going to argue that's part of him, his knowledge, et cetera, et cetera. So you've got to respond to that, I think. Absolutely, Your Honor. What I'd say to that is, Mr. Armbruster raised this issue because of cash flow in 2014. He asked them to go do a reconciliation of the balance sheet. They never brought the reconciliation back to him. I mean, it's undisputed that he didn't get an actual written document about those accounts until October 28th of 2016 from Mr. Lacey. So he knew that they were supposedly working on this, Your Honor, but no one came to him and said to him, with particular respect to these two accounts, that they need to be written off. I think the other key part, Your Honor, is you have to remember, like, we're talking about a company with 5,000 people, and the context of this is he's given certifications from Mr. Nags, who was acquitted, but people talking about these write-offs, they were acquitted, and they were the ones actually on the emails, Your Honor. The other important point here is the whole reason that, as we said, cash flow was the reason that Mr. Armbruster was looking at this. In 2015, as illicit testimony from his direct report, Mr. Bowen, cash flow was at a record high, and there's never been any suggestion by the government that it had anything to do with the fraud. So Mr. Armbruster teed up an issue, he asked his subordinates to look into this. They didn't bring anything to him saying that it had to be written off, and the problem that he knew resulted in him wanting to look at this had been writing. And so I think in terms of the big picture, those four witnesses, when you really look at what they say, the general nature of the testimony, and who they're talking about knew what, it doesn't add up to showing that Mr. Armbruster, knowingly and willfully, with respect to these two accounts. What about Mr. Kersl's analysis that showed that those accounts, balances shouldn't have been carried forward, that was sent to him in 2014, or that he was copied on? Absolutely, Your Honor. So that was May 15 and May 30 of 2014, or the two, Your Honor. And first of all, the first one was... I think there was one in October of 2014 as well, from Mr. Kersl. Yes, Your Honor. But I think, importantly, following those, Mr. Kersl, in November of 2014, Exhibit 1212,  and they will not likely have any visibility of these items in the upcoming months. And similarly, in December of 2014, Mr. Kersl inquired of the president of that company, Mr. Kirkland, and this may have jumped out, Your Honor, just because you need the swag email where you have the individual who runs Intermodal tells Mr. Kersl, we have a scientific wild ass guess and we're not going to know for months. So what I would say is there are some emails in there that talk about, we need to review this. We need to look at this. We need to look at these accounts. But there are similarly along the way, there are these points where no one came to him and said, the CFO of this company with dozens of subsidiaries, you need to write off these two accounts. And respectfully, that's where we are with these two counts. Maybe the other counts when they're alleging conspiracy and broader allegations. And if, may I reserve a minute, the remaining time for rebuttal? That's fine. Mr. Romano. Good afternoon. And may it please the Court, Don Alex Romano on behalf of the United States as appellee. The evidence was sufficient to support a defendant armbuster's convictions for securities fraud, falsifying the books and records of Roadrunner, and taking action to fraudulently influence Roadrunner's external auditor, drawing all reasonable inferences in favor of the guilty verdicts. A rational trier of fact could have found each and every offense element beyond a reasonable doubt. And unless the Court would prefer otherwise, I'll begin with the false books and records counts, which are six and seven. And as the Court knows, pertains to the two specific items on the balance sheet of intramodal that more or less remained unchanged from 2014 through 2016 when the scheme unravels. The first, just by way of recap, is that IKEA-related receivable of more than $400,000. And the second was the credit in prepaid taxes and license fees of around $600,000. And as the District Court found in denying the Rule 29 motion, the jury was entitled to credit to rely on the testimony of various witnesses, including Christopher Lacey and Heather Hipkey, to the effect that these amounts should have been written off before, in fact, they were, even as far back as 2014. Just by way of example, Heather Hipkey testified that you didn't need to do an actual reconciliation to know that these were problematic accounts. That's transcript 677 to 678. Christopher Lacey testified that he believed, you know, he's looking at this late in 2016, he believes these accounts needed to be resolved, the problem taken care of, two years earlier. How do you respond to Mr. DeVos' argument that nobody told his client this? That they may have believed that, and maybe from an accounting standpoint, they should have, but no one told him? Sure. And I think those are arguments that were made to the jury, and the jury could reject it. This was the CFO of a public company. It is ultimately his responsibility, as I think multiple witnesses testified, to ensure the accuracy of the financial statements. So if nobody came to him, why isn't he directing someone to go do this additional analysis and, in fact, Heather Hipkey testified that, you know, she didn't believe that you needed to do a reconciliation. These were stale balances. Again, we were just talking about the two that underline Counts 6 and 7. But she was frustrated with the defendant. He would always, I believe the gist of her testimony was that he would always want to kick the can down the road, want more research to be done, when, in fact, she didn't believe that more research needed to be done. Stephen Voorhees. Research into what? Research into collectability or research into the GAAP standard? I don't know that it got that granular as to what Ms. Hipkey testified. I understood her testimony to be sort of that she got a direction from Armbruster to just dig a little bit more to see, you know, whether it can be a supported balance or not. But by the time 2016 rolls around, in the case of the IKEA debt, it's a pre-2014 debt. And one of the documents that one of your honors referenced is Government Exhibit 184 and 184A. This is the, I believe, the email and the spreadsheet that Connor Cursell sends to Defendant Armbruster and others on May 30th of 2014. That spreadsheet, next to the IKEA-related receivable, it says, you know, the last activity was April of 2013. So that's more than 13 months before. And it also says, you know, probably a full write-off. And then next to the prepaid taxes amount, that spreadsheet says amount probably overstated or words to that effect. And Cursell went on to testify that an agreement was reached with Armbruster and others to reconcile the problematic accounts on Intermodal's balance sheet. That's transcript 1076. And he also testified that Defendant was the main person involved in decisions about Intermodal's balance sheet. That's transcript 1086. And there are other documents that reflect the defendant's knowledge that were sent to him in 2014. The jury could rely on the fact that he got those emails. It could make the reasonable conclusion that given his role as CFO, given who was sending these things to him, given all the testimony, that he'd looked at the spreadsheet, he And certainly when you get close to, you know, when the scheme unravels, when you have the white board meeting, before the white board meeting, on October 28th of 2016, Heather Hipkey, who again is the Vice President of Finance, she emails Armbruster in response to concerns raised by Christopher Lacey, who's then the controller at Intermodal. And Ms. Hipkey says, this is a government exhibit, I believe it's 57 or 57A, Hipkey says that Mr. Lacey has identified more than $9 million in potential balance sheet exposure. And in her email, she has Email to Armbruster? Correct. Yes. And in the email, it highlights various accounts in the body of the email, and I believe there's also a spreadsheet attached. And one of the accounts that's highlighted is the IKEA receivable, it says no activity in 2016. Another account that's in the body of the email is a prepaid taxes, which sort of the gist of the comment is, why aren't we amortizing this amount? And we know that Armbruster reads this email because he responds to it. He responds by asking for a spreadsheet to be sent to him with the accounts in question highlighted, which Mr. Lacey does, and I believe that's government exhibit 58 and 58A. And so that gets sent to Defendant Armbruster. Again, the jury could easily find knowledge here, and then about six days later, November 10th, you have the White Board meeting. And coming out, and that's with Defendant Armbruster, Heather Hipkey, and Mike Gettle, who's a senior corporate executive. And various issues are raised at that White Board meeting. And the next day, Mike Gettle... My pardon me, did those issues include these two accounts? Your Honor, the next day in that email, when Mike Gettle summarizes the White Board items... Yeah. He sends an email, which is government 38 and 38A, and I believe it's actually sent with high importance. And what Mr. Gettle does is he tries to quantify the exposure from all the items that are on the White Board. And one of those White Board items is intermodal balance sheet. And the exposure that Mike Gettle calculates is $3.5 to $6 million. So there was not an actual breakout in that spreadsheet for the IKEA-related receivable and the prepaid taxes, but there is an item in what Gettle sends around for intermodal balance sheet, and it quantifies the range of exposure there. And did he testify that that number would have picked those two items up? Mike Gettle did not testify, Your Honor. Okay. How did the fraud fall apart? I'm sorry? How did the fraud fall apart? It's a result of these issues getting raised. So four days later after the White Board meeting, as Your Honor knows, the financials get filed for the third quarter. And then two days later... And he issues the management letters... Correct. With all the knowledge acquired at that meeting. Correct. Of the same day. And then two days later, Curt Stotling, who I think is the incoming CEO, calls a meeting of the Board. Armbruster is there, but Stotling is sort of doing the presentation, and they disclose that to the Board that all these accounting issues with exposure to the company's financials were identified. And Brian Murray, who's the head of the Audit Committee at the time, he did testify. And he said his immediate reaction was, my gosh, he was just shocked because no one had told him... And he had been allowed to sort of... I don't know if he formally signed off on the financials that were filed for the third quarter, but he's not advised of this until after the Q3, the 10-Q for the third quarter gets filed. And he's shocked. His immediate reaction is, we need to tell Deloitte. Then there's discussion of an internal investigation during that same meeting. And then at that point, Deloitte gets pulled in, and that is sort of the start of... Can I ask you a question about Deloitte? The audit partner, is his name Krasnov? That's correct. Okay. He did testify, right? That's correct, Your Honor. Okay. And what was his testimony as to what he believes was withheld from Deloitte during the operative periods? So, for example, he was asked about the items identified at the white board meeting. There was some kind of... Had you known about this series of emails? I was trying to piece that together a little bit. Do you remember anything like that? I think he was shown... Emails from the 2014 period. Correct, Your Honor. He may have been asked if you had known that these issues were alive back in 2014, would that have been important to you, and it would have been a reference to the intermodal. Yeah. He may have been asked that. He was asked if you had learned that this meeting occurred, referencing the white board meeting, where $25 to $50 million of items of potential exposure were raised with that concern. He said, yes, I would have wanted to know that before I signed off on the financials for the third quarter of 2016. So he did testify to that. Certainly, you have the testimony also from Brian Murray about... He testified that if he had known about the intermodal issues at the time, what his testimony was that after learning about the intermodal issues, he did not believe that the 10Q should have been filed. And then, of course, you also had testimony from Heather Hipkey, which the jury could agree with the accuracy of the representations in the management rep letter, disagreeing with Defendant Armbruster's certification that accompanied the 10Q. I see that my time has expired, but I'm happy to answer any additional questions the Court may have. We ask that the Court affirm the convictions. Thank you. Thank you. Mr. DeVos. Thank you, Your Honor. If I just may briefly address a couple of the points raised. One, Your Honor, a really good question about the whiteboard and the document Mr. Gettle put together after coming out of it. Intermodal was mentioned, but notably, Your Honor, he on his own, you look at the record, he moved it from a known item to require quantification, outside help required for the unreconciled balance sheet items at intermodal. That's from Mr. Gettle, not from Mr. Armbruster. In terms of the knowledge of this information of what was going on at intermodal, in terms of Mr. Lacey, I would urge the Court to look at Mr. Lacey's testimony. He never says that he knew he talked to Mr. Armbruster that there should be a write-up. And when Mr. Armbruster receives that email, finally in October of 2016, about these accounts, he doesn't bury it. As counsel said, he asked him to highlight the accounts he's talking about. So there's no, and that relates to two other points I want to make in terms of transparency or cover-up. Coming out of the whiteboard meeting. But then he doesn't do anything. Well, Your Honor, coming out of then, it's November 4th when he sends that email. They have their meeting on November 10th. And the board meeting is several days later. And those issues actually are raised. And no one says pull the queue. No one, everyone just says we should bring in outside help to figure out what's going on. And I think that's a crucial point. Respectfully, Mr. Murray did not say had he known about intramural he would have pulled the queue because he was told about intramural in the middle of November and they did not pull the queue until the middle of January. I understand the standard. But when you look at the specific evidence, I think this is a case where there are broader charges and these specific counts remaining, that evidence did not prove beyond a reasonable doubt. Thank you, Your Honor. Thank you very much. Thanks to both counsel. The case is taken under advisement. And that concludes our calendar for today. The court is in recess.